# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

THE GARAGE ASSOCIATED WITH 2817
UNIVERSITY AVE. APARTMENT #5, GREEN BAY,
STATE AND EASTERN DISTRICT OF WISCONSIN

)
)
)
)
)
)

Case No. ___20M735___

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Property described as: A WARRANT AUTHORIZING THE SEARCH OF THE GARAGE ASSOCIATED WITH 2817 UNIVERSITY AVE. APARTMENT #5, GREEN BAY, WISCONSIN, GREEN BAY, STATE AND EASTERN DISTRICT OF WISCONSIN, described in Attachment A, incorporated herein.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: which constitutes evidence of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957, and Title 18, U.S.C. Sections 922 and 924, conspiracy to distribute and possession with intent to distribute controlled substances and associated money laundering crimes, and firearm possession by prohibited person and in furtherance of drug trafficking.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_                  10/6/20 1:14pm.

Matthew Secor, FBI TFO
_Printed Name and Title_

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by
TELEPHONE (specify reliable electronic means):
Date: ___10-6-2020___

_Judge's signature_

JAMES R. SICKEL          U.S. Magistrate Judge
_Printed Name and Title_

City and State: Green Bay, Wisconsin

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE
SEARCH OF THE GARAGE ASSOCIATED WITH 2817 UNIVERSITY AVE. APARTMENT
#5, GREEN BAY, WISCONSIN AND LOCATED AT 2817 UNIVERSITY AVE. GREEN
BAY, WISCONSIN. 2817 UNIVERSITY AVE. IS A MULTI-UNIT APARTMENT
BUILDING CONSTRUCTED OF TAN BRICK WITH A BLACK ROOF. THE NUMBERS
"2817" APPEAR IN BLACK NUMBERS ON THE SOUTH WEST CORNER OF THE
BUILDING. APARTMENT #5 HAS A GARAGE ASSOCIATED WITH THE APARTMENT
THAT IS LOCATED ON THE GROUND FLOOR OF THE BUILDING AND IS NOT
ATTACHED TO THE APARTMENT. THE GARAGE DOORS ARE TAN IN COLOR AND
FACE SOUTHWEST. THE INTERIOR ENTRACE TO THE GARAGE ASSOCIATED WITH
APARTMENT #5 IS BROWN IN COLOR AND MARKED WITH A GOLD NUMBER 5.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matthew J. Secor being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the State of Wisconsin as well as a

   federally deputized law enforcement officer, under the authority and agreement from the

   Federal Bureau of Investigation, to conduct drug investigations in violation of Title 21,

   United States Code. As such, I am an "investigative or law enforcement officer of the

   United States" within the meaning of Title 18, United States Code, Section 2510(7), that

   is, an officer of the United States, who is empowered by law to conduct investigation of,

   and make arrests for, controlled substance offense enumerated in Title 21, United States

   Code.

2. I have been employed by the Green Bay Police Department (GBPD) as a full time sworn

   law enforcement officer since March of 2007. I am currently assigned as a Narcotic

Investigator with the Brown County Drug Task Force (BCDTF) and have been assigned in this position since January 2018. I am a Detective in the Investigative Division at the Green Bay Police Department, and have been so assigned from February of 2017 to present. I was previously employed by the Brown County Sheriff's Department as a full time sworn law enforcement officer from August 2000 through March 2007. I was assigned as a Narcotics Investigator with the Brown County Drug Task Force from March 2005 through March 2007. During this time your affiant has attended the Wisconsin Department of Justice Division DCI Basic Narcotics Investigation Training. I have received training in working with confidential informants and interview and interrogation. I have purchased controlled substances in an undercover capacity and by using confidential informants. I received on the job training in regards to robbery, battery, drug identification, evidence collection, video/visual/audio surveillance, and search warrant executions. I have authored search warrants and interviewed suspect and confidential informants about their experience and knowledge of drug use and distribution. I am familiar with the street names of various drugs in Wisconsin, as well as the methods that are commonly used by drug dealers to package, ship and prepare controlled substances for sale or use in Wisconsin. I am familiar with the nature of drug trafficking and the behavior and patterns of those involved in using and distributing controlled substances.

3. The facts in this affidavit come from the Federal Bureau of Investigation (FBI), the Brown County Drug Task Force (BCDTF), the Drug Enforcement Administration (DEA), other law enforcement agencies, and witness statements, all of which I believe to be truthful, in addition to my personal observations, training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Carlos L. RAMIREZ-Morales, also known as "Coco", has committed violations of Title 21 U.S.C. § 846, 841(a), (b)(1)(A) (conspiracy to distribute and possess with the intent to distribute cocaine and heroin). Evidence of such conduct will likely continue to be obtained by searching the premises controlled by Yary Z. Arroyo-Pagan and identified as the garage of the residence located at 2817 University Ave. #5, Green Bay, State and Eastern District of Wisconsin as further described in Attachment A with items to be seized in Attachment B.

5. Based on my training, experience, and my participation in drug trafficking investigations and associated financial investigations involving large amounts of marijuana, methamphetamine and/or other controlled substances, I know and have observed:

   a. that people involved in drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to launder the proceeds; such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control;

   b. that drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

   c. that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      that drug traffickers must maintain on-hand large amounts of U.S.
        currency in order to maintain and finance their ongoing drug business;

e.      that it is common for drug traffickers to maintain books, records, receipts,
        notes, ledgers, airline tickets, receipts relating to the purchase of financial
        instruments and/or the transfer of funds, and other papers relating to the
        transportation, ordering, sale and distribution of controlled substances; the
        aforementioned books, records, receipts, notes, ledgers, etc., are
        maintained where the drug traffickers have ready access to them;

f.      that it is common for drug dealers to secrete contraband, controlled
        substances, proceeds of drug sales and records of drug transactions, asset
        purchases and other items noted in the Attachment to this warrant in
        secure locations within their residences, storage lockers and/or garages
        associated with their residences, businesses, vehicles and/or other
        locations over which they maintain dominion and control, for ready access
        and to conceal these items from law enforcement authorities;

g.      that in order to accomplish this concealment, drug traffickers frequently
        build stash places within their residences or business; there are a number
        of publications available instructing where and how to build stash places;
        copies of these types of publications have been found in the residences of
        drug traffickers;

h.      that it is common for persons involved in drug trafficking to maintain
        evidence pertaining to their obtaining, secreting, transfer, concealment
        and/or expenditure of drug proceeds, such as currency, financial
        instruments, precious metals and gemstones, jewelry, books, records,
        invoices, receipts, records of real estate transactions, bank statements and
        related records, passbooks, money drafts, letters of credit, money orders,
        bank drafts, cashiers checks, bank checks, safe deposit box keys and
        money wrappers; these items are maintained by the drug traffickers within
        their residences, businesses or other locations over which they maintain
        dominion and control;

i.      that drug traffickers often utilize electronic equipment such as computers
        and cellular telephones to generate, transfer, count, record and/or store the
        information described in items a, c, d, e, g and h above;

j.      that when drug traffickers amass large proceeds from the sale of drugs, the
        drug traffickers attempt to legitimize these profits through money
        laundering activities; to accomplish these goals, drug traffickers often
        utilize domestic and international banks and their attendant services,
        securities brokers, professionals such as attorneys and accountants,
        casinos, real estate, shell corporations and business fronts and otherwise
        legitimate businesses which generate large quantities of cash;

k.   that the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money);

l.   that it is common for drug dealers to physically handle and count the street money after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the street money; law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences, businesses, and other locations controlled by drug traffickers;

m.   that it is common for drug dealers to separate their street money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

n.   that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

o.   that the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

p.   that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q.   that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the source of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other locations under the dominion and control of drug traffickers;

r.     that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephone memory, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s.     that drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their product; these traffickers usually maintain these photographs in their possession;

t.     that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u.     that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug traffickers property. Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records and United States currency;

v.     that the techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of counter-surveillance, multiple locations at which to conduct drug related activities and to keep records and drug, hidden compartments in vehicles used to hide drug and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and workers to further their criminal enterprise;

w.     that drug traffickers commonly front (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences;

x.     that drug traffickers commonly use telephones whether a land line (home telephone) or cellular telephones to arrange for drug purchases or deliveries. It is also common for drug traffickers to maintain and use several cellular telephones at the same. Typically, when a drug trafficker switches to a new cellular telephone he/she will keep that phone and not destroy it. Among other reasons, the Drug trafficker will do so to maintain the list of drug related contacts that have been accumulated. gso;

y.     that drug traffickers usually keep paraphernalia for packaging, cutting, cooking, weighing and distribution of controlled substances in their residences and in a stash house locations, specifically locations used by the conspiracy to conduct these activities;

z.    that drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and taxi cab receipts.

## CONFIDENTIAL SOURCES RELIABILITY

6.    The information relating to drug violations described in this affidavit is predicated, in part, upon conversations with individuals in a position to be aware of the activities of RAMIREZ-MORALES and others known and yet unknown. These persons, referred to herein as CIs (Confidential Informants) and CSs (Confidential Sources), and CHSs (Confidential Human Sources) have provided valuable information about the illegal drug activities about members of the DTO and RAMIREZ-MORALES' associates and their distribution networks. The information provided by the CIs, CSs, and CHSs have proven to be reliable as described below, and much of the information provided has also been corroborated through other investigative techniques such as surveillance and telephone toll analysis. A CI's and a CHSs identity is always known to law enforcement, and the CI and CHS agrees to provide information to law enforcement and oftentimes conduct controlled drug buys for law enforcement. A CS's identity is also generally known to law enforcement. But a CS usually wishes to provide information anonymously while not actively cooperating with law enforcement to the same extent as a CI and CHS.

## **RELEVANT FACTS**

7. In July 2019, The Brown County Drug Task Force (BCDTF) along with the United States Drug Enforcement Agency (DEA), Federal Bureau of Investigation (FBI) and other law enforcement agencies started investigating RAMIREZ-MORALES, and others known and unknown, concerning possible violations of Title 21 U.S.C. § 846, 841(a), (b)(1)(A)

(Conspiracy to distribute and possess with the intent to distribute cocaine and heroin). Soon after, Investigators from the BCDTF and FBI-Green Bay met with the DEA Investigators in Milwaukee who were investigating Jose Gonzalez-Collado, identified as a source of supply of controlled substances for RAMIREZ-MORALES. An open line of communication and information sharing along with de-confliction of target subjects was established. It was determined that RAMIREZ-MORALES was the head of the DTO in Green Bay, WI., and was partially being supplied narcotics (cocaine and heroin) from Gonzalez-Collado in Milwaukee, WI. Based on my investigation, I believe RAMIREZ-MORALES stores controlled substances at his residence as well as other locations including 2817 University Ave. #5, Green Bay, WI, (Subject Premises), occupied by Yari Arroyo-Pagan.

8.  During the BCDTF investigation into RAMIREZ-MORALES, Milwaukee HIDTA took Gonzalez-Collado and members of his DTO into custody. Gonzalez-Collado and members of his DTO were subsequently federally charged with numerous narcotics distribution and conspiracy to commit offenses, along with weapon related offenses.

9.  The investigation into RAMIREZ-MORALES to date has included law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information, information from other law enforcement officers; pen register, trap and trace telephone toll data, controlled drug buys, Title III wire intercepts, and GPS locating of target vehicles and physical surveillance.

10. During the course of this investigation it was known that RAMIREZ-MORALES resides at 2811 University Ave. #5 in the City of Green Bay, Brown County, State and Eastern District of Wisconsin. The address 2811 University Ave. is located at the Royal Oak

Apartment Complex, which includes four (4) multi-unit apartment buildings located at 2811, 2813, 2815, and 2817 University Avenue. Investigators have determined that other co-conspirators, family members, and/or other associates of RAMIREZ-MORALES reside in the several of the apartments contained in the Royal Oak Apartment Complex.

11. Investigators have identified Sayi Ramirez-Morales (10/08/86) as the sister of Carlos RAMIREZ-MORALES. WI DOT records list Sayi's most recent address as 2813 University Ave. #4, Green Bay, WI. Rudie Carlos Arroyo-Pagan (04/13/81) has been identified as the husband of Sayi Ramirez-Morales. Wisconsin DOT records list 2813 University Ave. #4 as Rudie Arroyo-Pagan's listed address, updated June 2020.

12. CI 1967 reported that Rudie is associated with Carlos RAMIREZ-MORALES' sister (Sayi). CI 1967 further identified Yary as Rudie's sister, stating that Yary lives in the same apartment complex as Carlos RAMIREZ-MORALES.

13. Yary was identified as Yary Z. Arroyo-Pagan (DOB 04/09/78). Green Bay Police records list Yary's address as 2817 University Ave. #5, Green Bay, WI, (Subject Premises) phone number (920) 471-2861 during a July 22, 2020 contact. WI DOT records list 2817 University Ave. Apt 5, Green Bay, WI as Yary's address, updated June 21, 2020.

14. On September 23, 2020 investigators received a tenant list for 2817 University Ave. #5 listing the occupant as "Yari Arryo-Pagan".

15. I know that in 2018. Law enforcement sent an administrative subpoena to the cell carrier for (920) 471-2861 and records show the number was registered to Carlos Arroyo with address of 2622 University Ave. Apt. #3, Green Bay, WI. 54311. Investigators believe that the account holder "CARLOS ARROYO" is Yary's brother, Rudie Carlos Arroyo-Pagan,

but that the phone is utilized by Yary. GBPD records confirm that Rudie Carlos Arroyo-Pagan listed a different phone number (920-548-7002) during a December 2019 incident.

## CI-1967 RELIABILTY AND COMPENSATION

16. For several reasons, case agents believe CI-1967 to be reliable and credible. CI-1967 has been providing information since approximately January 2020, which is against CI-1967's penal interest. CI-1967 has had ample opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. The information provided by CI-1967 is consistent with evidence obtained elsewhere in this investigation. Substantial portions of CI-1967's information have been corroborated through independent investigation including recorded conversations, surveillance, information obtained from various public databases, other confidential sources and subsequent controlled buys made by Investigators. According to law enforcement databases, CI-1967 has a felony conviction along with misdemeanor convictions include; numerous narcotics convictions, theft, robbery, burglary, receiving stolen property. CI-1967's information has never been found to be false or misleading. CI-1967 is cooperating in exchange for consideration on a case investigated by the Green Bay Police Department. CI 1967 has received monetary compensation on one occasion after providing information.

### *CI-1950 Reliability and Compensation*

17. For several reasons, case agents believe CI-1950 to be reliable and credible. CI-1950 has been providing information since approximately July 2019, which is against CI-1950's penal interest. The information provided by CI-1950 is consistent with evidence obtained

10 | P a g e

elsewhere in this investigation. Substantial portions of CI-1950's information have been corroborated through independent investigation including recorded conversations, surveillance, information obtained from various public databases, other confidential sources and subsequent controlled buys made by Investigators. CI-1950's information has never been found to be false or misleading. According to law enforcement databases, CI-1950 has been convicted of Operating While Intoxicated, Possession of Drug Paraphernalia, Possession of THC, Trespassing, and Bail Jumping. In exchange for CI services, CI-1950 was receiving consideration on a Green Bay Police drug offense, which has been resolved. CI-1950 is now cooperating in exchange for occasional monetary compensation.

## **INTERCEPTED WIRE COMMUNICATION**

18. Law enforcement obtained wiretap orders from United States District Court Judge William C. Griesbach on July 13, 2020 to intercept wire communications occurring over RAMIREZ-MORALES' cellular telephone number, TARGET TELEPHONE 101. This order was renewed on August 12, 2020. Analysis of the intercepted communications and GPS data relevant to the garage at 2817 University Ave. #5 revealed pertinent case information.

19. A review of cellular phone data of TARGET TELEPHONE-101 identified 138 calls/25 texts with (920) 471-2861 (Yary Arroyo-Pagan phone) between February 8, 2020, and September 23, 2020, including 19 calls/3 texts during the intercept period of July 14, 2020, and September 11, 2020. Additionally, 25 communications were identified between Facebook accounts associated with RAMIREZ-MORALES and Arroyo-Pagan between February 27, 2020 and May 13, 2020.

20. On August 20, 2020, at approximately 11:43pm, BCDTF intercepted a call between RAMIREZ-MORALES and Joseph Bobe-Valladares which was translated and summarized. Bobe-Valladares has been identified as a co-conspirator in RAMIREZ-MORALES DTO and it is known that he stores controlled substances, including heroin, at his residence and/or the garage associated with his residence at 2813 University Ave. #8. It is believed that Bobe-Valladares also sells controlled substances for RAMIREZ-MORALES. The following are relevant points from that conversation.

    a. RAMIREZ-MORALES asks for Bobe-Valladares' whereabouts. RAMIREZ-MORALES tells Bobe-Valladares that he wants to take everything out of Bobe-Valladares' house. RAMIREZ-MORALES explains he saw a Black Silverado van/SUV with two Americans that parked at Denny's [PH] house got out and pretended to enter an elderly couple's residence when observed by RAMIREZ-Morales. RAMIREZ-MORALES says that he is hardly selling the green and the other thing and will take them out. RAMIREZ-MORALES says that if someone wants to buy an ounce, he would rather go get it at the other place if he doesn't have it there. RAMIREZ-MORALES asks Bobe-Valladares to put the "lenta" (believed to be heroin) in the bag and take it out. RAMIREZ-MORALES says the only thing he's going to keep is "pin-pin" (believed to be cocaine). Bobe-Valladares asks what they are going to keep and RAMIREZ-MORALES answers that he's going to get the weed and the lenta [heroin] out and will only leave the pin-pin. RAMIREZ-MORALES says he is not paranoid, but he doesn't want anything to happen if he's not selling a small ball and adds that he knows where he can keep/store it. Bobe-Valladares asks if RAMIREZ-MORALES thinks that

they are agents and RAMIREZ-Morales answers that he thinks they are cops. RAMIREZ-MORALES adds that he can't think that they're thugs that he has to think the worst, and this is why he wants to remove the items. RAMIREZ-MORALES tells Bobe-Valladares that he will go out, they will leave Bobe-Valladares' car at RAMIREZ-MORALES' father's residence, and will go on to store it. Bobe-Valladares says his car is in the garage. RAMIREZ-MORALES tells Bobe-Valladares to take out the lenta [heroin] and the big scale. RAMIREZ-MORALES says the lenta is in the gas tank near the [UI]. RAMIREZ-Morales tells Bobe-Valladares to put everything in the bag. RAMIREZ-Morales says if they go to his house and they don't find anything he will put one on their back and they will regret it.

b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES and Bobe-Valladares moving marijuana and heroin from Bobe-Valladares residence to RAMIREZ-MORALES' storage unit after RAMIREZ-MORALES observed investigators outside of his apartment complex during a GPS install. RAMIREZ-MORALES suspected the investigators may be law enforcement and subsequently contacted Bobe-Valladares telling him they will move his controlled substances to a storage unit, located in the Village of Bellevue.

21. That same day, at approximately 11:52pm, BCDTF intercepted a call between RAMIREZ-MORALES and Joseph Bobe-Valladares which was translated and summarized.

a. Bobe asks if they left. RAMIREZ-MORALES says they did a while ago. RAMIREZ-MORALES says he went downtown (Green Bay) to see if he had seen him there. He saw a vehicle that looked similar but it was sort of dirty and there was an American [gringo] with a beard. But since they saw how RAMIREZ-MORALES looked at them, then they went back. RAMIREZ-MORALES says they have seen that he-RAMIREZ-MORALES goes in there a lot. Bobe acknowledges and asks for his location. RAMIREZ-MORALES says he is home. Bobe says he is in the garage. RAMIREZ-MORALES says he' will go stash with his friend about half an ounce of pin pin [coke] Bobe then says he will bring it back. Bobe calls out to RAMIREZ-MORALES. Then Bobe asks RAMIREZ-MORALES to come down. RAMIREZ-MORALES agrees to do so.

b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES driving to the area of the BCDTF following his observations of investigators in an attempt to identify the vehicle he suspected to possibly be law enforcement. RAMIREZ-MORALES also tells Bobe-Valladares that he will stash half an ounce of "pin pin" known to be coded language for cocaine, with a friend. Based on this conversation it is known that RAMIREZ-MORALES has utilized individuals, other than Bobe-Valladares, to store controlled substances.

22. On August 22, 2020, at approximately 11:01am, investigators intercepted a communication between RAMIREZ-MORALES and Luis Carrion, which was translated and summarized. Carrion was identified as a customer of RAMIREZ-MORALES, purchasing cocaine from him. The following are relevant points of that conversation:

a.  Carrion and RAMIREZ-MORALES discuss a car parked outside of RAMIREZ-MORALES' apartment complex belonging to RAMIREZ-MORALES' nephew. Carrion laughs while he says that they know RAMIREZ-MORALES has control of the whole apartment complex.

b.  Based on my training and experience, in addition to my knowledge of this investigation, this conversation is related to RAMIREZ-MORALES' affiliation with other tenants of the Royal Oak Apartment complex and the statement that he controls other individuals living in that complex.

23.  On August 24, 2020, at approximately 3:16pm, investigators intercepted a communication between RAMIREZ-MORALES and a female at 920-471-2861, believed to be Yary Arroyo-Pagan, which was translated and summarized. The following are relevant points of that conversation;

a.  RAMIREZ-Morales refers to Arroyo-Pagan as Picha (PH). Arroyo-Pagan is at a third party's house [no details] and RAMIREZ-MORALES tells her to let him know when she is able to talk. Arroyo-Pagan asks RAMIREZ-MORALES to talk to her. RAMIREZ-MORALES asks about Arroyo-Pagan whereabouts and she answers that she is close by. RAMIREZ-MORALES then says he knows this because her garage is open. RAMIREZ-MORALES says he's outside and asks Arroyo-Pagan to come over to his location, which she agrees to do.

b.  Based on my training and experience, in addition to my knowledge of this investigation, it is known that this conversation is related to RAMIRZ-MORALES talking about Arroyo-Pagan's garage, which it is believed he would later utilize as a storage location for controlled substance.

15 | P a g e

24. That same day at approximately 8:13pm, investigators intercepted a communication between RAMIREZ-MORALES and 920-471-2861, believed to be Yary Arroyo-Pagan, which was translated and summarized. The following are relevant points of that conversation:

    a. Incoming text to RAMIREZ-MORALES from 920-471-2861, "5896".

    b. Based on my training and experience, in addition to my knowledge of this investigation, this message is believed to be the code for Yary's garage door. I know that garages at 2817 University Ave. appear to be equipped with exterior coded door openers.

25. On August 29, 2020 at approximately 6:23pm, BCDTF intercepted a call between RAMIREZ-MORALES and Michael Acevedo which was translated and summarized. Acevedo was identified as a customer of RAMIREZ-MORALES, purchasing cocaine and marijuana from him. The following are relevant points for that conversation.

    a. Acevedo tells RAMIREZ-MORALES he is at RAMIREZ-MORALES' house. RAMIREZ-MORALES asks Acevedo to wait for him because he is by Subway. Acevedo asks if RAMIREZ-MORALES will take long and RAMIREZ-MORALES answers in the negative. Acevedo tells RAMIREZ-MORALES he has many deliveries to make. RAMIREZ-MORALES asks if Yari or anyone else is in front of his place. Acevedo answers that no one is there. RAMIREZ-MORALES will call his wife so she can go down and meet Acevedo. RAMIREZ-MORALES tells Acevedo that he never came to get an unnamed item. Acevedo acknowledges and asks if he should wait for RAMIREZ-MORALES. RAMIREZ-MORALES and Acevedo agree to meet at Wendy's Restaurant.

b. Based on my training and experience, in addition to my knowledge of this investigation, this conversation details a meeting between RAMIREZ-MORALES and Acevedo. During this call, RAMIREZ-MORALES specifically mentions "Yary" in the context of a possible drug transaction. I believe that Yary is involved with the storing and/or sale of controlled substances for RAMIREZ-MORALES.

26. On September 1, 2020, at approximately 4:27pm, BCDTF intercepted a call between RAMIREZ-MORALES and the user of cell phone 920-471-2861, believed to be Yary Arroyo-Pagan. The following are relevant points for that conversation.

    a. RAMIREZ-MORALES calls Arroyo-Pagan and asks where did they go. She says to the bank. They talk about food. RAMIREZ-MORALES says tomorrow he's going to take some money to that crazy one. Arroyo-Pagan says she will call when she leaves the bank.

    b. Based on my training and experience, in addition to my knowledge of this investigation, this conversation is relevant as it displays continued communication between RAMIREZ-MORALES and Yary Arroyo-Pagan.

27. On September 2, 2020 at approximately 3:48pm, BCDTF intercepted communications between RAMIREZ-MORALES and the user of cell phone 920-471-2861, believed to be Yary Arroyo-Pagan. The following are relevant points for that conversation.

    a. Incoming text to RAMIREZ-MORALES from 920-471-2861, "Come by the house".

b. Based on my training and experience, in addition to my knowledge of this investigation, this conversation is relevant as it is believed Yary is telling RAMIREZ-MORALES to come to her residence.

28. That same day at approximately 9:21pm, BCDTF intercepted a cell phone call between RAMIREZ-MORALES and Yary Arroyo-Pagan. The following are relevant points for that conversation.

a. RAMIREZ-MORALES calls Yary and asks if his garage is open. She asks if he's going to put something in her garage. He says not now, he's tired. Yary says it's just good to know which one of the boxes he will use to keep them. Yary said she left the boxes there, so he can cover them with the box. He says he knows. She says to swing by in the morning to get the 40 bucks because she paid Eric [PH] the rent. RAMIREZ-MORALES says when he gets off early. She says that's fine, she doesn't have to work until Wednesday and RAMIREZ-MORALES knows how to get in. RAMIREZ-MORALES agrees with her.

b. Based on my training and experience, in addition to my knowledge of this investigation, this conversation involves RAMIREZ-MORALES asking Yary if her garage is open with her questioning whether he was going to put something in the garage. Yary indicates that she wants to know in which box RAMIREZ-MORALES will keep "them" so she can cover it. I believe "them" refers to controlled substances. RAMIREZ-MORALES indicates that he knows how to get in the garage, corroborating the belief that the previous message on August 24th was the code for Yary's garage. I believe this conversation is related to RAMIREZ-MORALES storing controlled substance in Yary's garage

29. On September 4, 2020, at approximately 9:05pm, BCDTF intercepted communications between RAMIREZ-MORALES and user of cell phone 920-471-2861, believed to be Yary Arroyo-Pagan. The following are relevant points for that conversation.

    a. Incoming text to RAMIREZ-MORALES from 920-471-2861, "Put it under one of the boxes".

    b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this communication relates to RAMIREZ-MORALES storing controlled substance in Yary's garage. This is corroborated by the chronological order of the messages between RAMIREZ-MORALES and Yary relating to Yary's garage.

30. On September 9, 2020 at approximately 9:41am, BCDTF intercepted cell phone calls between RAMIREZ-MORALES and Arsenio Rosado-Gomez. Rosado-Gomez was identified as a controlled substance customer of RAMIREZ-MORALES. It is further believed that Rosado-Gomez obtained ammunition and/or firearms for RAMIREZ-MORALES. The following are relevant points for that conversation.

    a. Rosado-Gomez says he's on his way to pick "it" up and to give RAMIREZ-MORALES the money. RAMIREZ-MORALES says he has it in the trunk of his car. Rosado-Gomez asks why. RAMIREZ-MORALES replies that he figured that way he doesn't have to go in the morning to the place where he stores it.

    b. Based on my training and experience, in addition to my knowledge of this investigation, it is believed this conversation is related to Rosado-Gomez paying RAMIREZ-MORAELS for either controlled substances or possibly a firearm. During previous conversations, Rosado-Gomez and RAMIREZ-MORALES

discussed Rosado Gomez obtaining firearms for RAMIREZ-MORALES for him to sell for profit. On September 9, 2020, Rosado Gomez asked RAMIREZ-MORALES what he was going to do with what Rosado Gomez provided to him because he can't keep it there too long with everything that is going on. RAMIREZ-MORALES said he would take them all that week when he obtains the money. Previous conversations also suggest that RAMIREZ-MORALES obtained a semi-automatic firearm that he intended to sell to Rosado-Gomez. Further, RAMIREZ-MORALES sold controlled substances to Rosado Gomez on a regular basis. This is likely to continue as on September 9, 2020, RAMIREZ-MORALES told Rosado-Gomez during an intercepted conversation that he was expecting a quantity of controlled substances that day for which he had already paid the supplier. Thus, these conversations are relevant as it shows that RAMIREZ-MORALES is storing controlled substances and potentially firearms at locations outside of his residence.

31. That same day at approximately 9:04pm, BCDTF intercepted a cell phone call between RAMIREZ-MORALES and Jesus Reyes. Reyes was identified as a supplier of heroin and marijuana for RAMIREZ-MORALES. The following are relevant points from that conversation.

   a. RAMIREZ-MORALES and Reyes talk about a male (believed to be Bobe-Villadares) that knows the code to RAMIREZ-MORALES' safe. RAMIREZ-MORALES advised that he stored things in his (Bobe-Villadares) house and nothing has ever been stolen. Reyes asks about the items stolen and RAMIREZ-MORALES reminds Reyes that he told him about keeping one of the old ones

(pounds of marijuana). RAMIREZ-MORALES advised he also had four pounds of the new one there (in the storage unit). RAMIREZ-MORALES says he had three in his safe at a friend's house close to his house. RAMIREZ-MORALES tells Reyes he took an unnamed items there (storage unit) but took it out and brought it over to his friend's house.

b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES discussing the seizure of marijuana from his storage unit with Reyes. As more fully explained below, I know that on September 8, 2020, BCDTF investigators and other law enforcement executed a search warrant at RAMIREZ-MORALES's storage unit and seized approximately 5.5 pounds of marijuana. During their conversation, RAMIREZ-MORALES and Reyes discuss a male's (believed to be Bobe-Villadares) residence where RAMIREZ-MORALES has stored items in the past without them being stolen. I believe RAMIREZ-MORALES and REYES were discussing whether Bobe-Villardes was involved in stealing the marijuana, obviously unaware it had been seized by law enforcement. RAMIREZ-MORALES also identifies that he has three pounds of marijuana in his safe at an unidentified friend's house, close to his house. I believe RAMIREZ-MORALES is either referencing Bobe-Villardes' residence or Arroyo-Pagan's garage and shows that RAMIREZ-MORALES stores controlled substances at locations outside of his residence and with other associates.

32. On September 10, 2020 at approximately 5:25pm, BCDTF intercepted a cell phone call between RAMIREZ-MORALES and Omar Vazquez-Caraballo, identified as a drug

21 | P a g e

customer and distributor of controlled substances received from RAMIREZ-MORALES.
The following are relevant points for that conversation.

    a.  Vazquez-Caraballo asks RAMIREZ-MORALES if he has drugs to sell.
RAMIREZ-MORALES replies he needs time to obtain it. Vazquez-Caraballo
asks how long it will take him. RAMIREZ-MORALES asks who Vazquez-
Caraballo would be coming with. Vazquez-Caraballo replies that he'd go with
[UI]'s brother.

    b.  Based on my training and experience, in addition to my knowledge of this
investigation, I believe this conversation confirms that RAMIREZ-MORALES
stores controlled substances at locations other than his residence.

33. On September 11, 2020 at approximately 9:36am, BCDTF intercepted a cell phone call
between RAMIREZ-MORALES and Arsenio Rosado-Gomez. The following are relevant
points from that conversation.

    a.  Rosado-Gomez and RAMIREZ-MORALES discuss the theft of marijuana from
the storage unit. Rosado-Gomez asks RAMIREZ-MORALES who else would
know that drugs were stored at that location. RAMIREZ-MORALES replied that
his friend, who's always with him, knows all about this. RAMIREZ-MORALES
also stated he stores some of his stuff at his friend's house.

    b.  Based on my training and experience, in addition to my knowledge of this
investigation, it is believed this conversation is related to RAMIREZ-MORALES
speaking with Rosado-Gomez about storing controlled substance at his friend's
house.

34. That same day at approximately 3:15pm, BCDTF intercepted a call between RAMIREZ-Morales and Jesus Reyes. The following are relevant points for that conversation.

    a.  RAMIREZ-MORALES tells Reyes that he has about 5 ounces left of the black (believed to be heroin provided previously by Reyes). RAMIREZ-MORALES explains that he owes Jesus about $7,000, and that he's going to give him about $4,900 that he has at home, plus about $500. RAMIREZ-MORALES adds that he has about ¾ of the green.

    b.  Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES admitting that he possessed five (5) ounces of heroin, $4,900 in drug proceeds, and an undetermined amount of marijuana on hand. Given RAMIREZ-MORALES also admitting that he stores controlled substances at other locations, I believe there is probable cause that controlled substances are at the Subject Premises.

## 2817 UNIVERSITY AVENUE

35. Based on my training and experience, I know that drug dealers frequently conceal contraband and at times firearms at locations outside of their residence. This can be done for many reasons including attempting to distance themselves from their illegal products and to conceal the location of both narcotics and U.S.C. By concealing these items off site drug dealers mitigate the risk of another drug dealer attempting to rob them at their residence and if the items are uncovered have deniability as to their true ownership.

36. Investigators have determined that RAMIREZ-MORALES utilized a storage unit at Storage Hub (Unit #118), located at 1901 Verlin Rd. in the Village of Bellevue, to store currency and controlled substances.

37. On September 8, 2020, investigators executed a search warrant at RAMIREZ-MORALES' storage unit seizing approximately 5.75 pounds of marijuana and 8.85 grams of an undetermined white powder. Law enforcement obtained delayed notification authority for the execution of this warrant and it was reported to RAMIREZ-MORALES that his storage unit was broken into by unknown subjects.

38. Based on the above described intercepted communications, I know that after RAMIREZ-MORALES was advised his marijuana had been stolen from his storage unit, he identified Bobe-Valladares as a possible individual involved in the theft given that he was one of the few individuals aware of the storage unit's existence. I also know from intercepted phone calls and CI statements that RAMIREZ-MORALES has stored controlled substances, including heroin, at Bobe-Valladares' garage. However, intercepted phone calls from August 20, 2020, indicated that RAMIREZ-MORALES and Bobe-Valladares removed controlled substance belonging to RAMIREZ-MORALES from Bobe-Valladares residence that day. This is a result of RAMIREZ-MORALES observing investigators outside of his apartment complex during a GPS install. At that time, RAMIREZ-MORALES did not definitively know the individuals were law enforcement, however suspected so and moved the heroin and marijuana.

39. Based on statements made by CI 1950 and CI 1967 and intercepted communications from Ramirez-Morales, I believe that following RAMIREZ-MORALES' observations of law enforcement on August 20, 2020, he and possibly others removed marijuana and heroin

from Bobe-Valladares residence and relocated his supply to his storage unit in the Village of Bellevue. I believe he also maintained a supply of cocaine at his residence as verified in intercepted communications and a controlled purchase of cocaine by CI 1950 at RAMIREZ-MORALES' residence on August 25th. I believe that on or around September 2nd RAMIREZ-MORALES began storing controlled substance in the garage associated with the Yary Arroyo-Pagan residence at 2817 University Ave. #5. I also believe that RAMIREZ-MORALES has possessed firearms and may be trafficking in firearms during the course of this conspiracy. Given his access to this garage, I believe it is probable that he may store firearms at this location as well. This is based in part by intercepted communications relayed above. RAMIREZ-MORALES has a family association to Yary and her residence is located in the same Royal Oak Apartment Complex, where RAMIREZ-MORALES currently resides. Based on intelligence from CI 1967, RAMIREZ-MORALES continues to store controlled substances at the residence of Bobe-Valladares despite intercepted communications that appear to refer to Bobe-Valladares having knowledge of the location of RAMIREZ-MORALES storage unit following the seizure of marijuana from this unit by law enforcement on September 8th. I believe that through the course of this investigation, RAMIREZ-MORALES has utilized multiple storage locations and it is believed he continues to do so to prevent the theft of controlled substance or seizure from law enforcement. Based on the above information I believe that RAMIREZ-MORALES is using both his residence and storage locations outside of his residence, which are controlled by trusted friends/family to house controlled substances and firearms, including the residence of Bobe-Valladares, and the garage of Yary Arroyo-Pagan.

## AUTHORIZATION REQUEST

40.    Based on the foregoing, I respectfully request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 authorizing a complete search of the attached garage associated with 2817 University Ave. Apartment #5, as further described in Attachment A and to seize items located in Attachment B.

_10/6/20 1:14 pm._

Matthew J. Secor
Narcotics Investigator
Brown County

Subscribed and sworn and attested to me reliable electronic means pursuant to the requirements FED R CRIM P 4.1(telephone)

this ___6___ day of October 2020

HONORABLE JAMES R. SICKEL
United States Magistrate Judge
Application No.

**ATTACHMENT A**

IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE
SEARCH OF THE GARAGE ASSOCIATED WITH 2817 UNIVERSITY AVE. APARTMENT
#5, GREEN BAY, WISCONSIN AND LOCATED AT 2817 UNIVERSITY AVE. GREEN
BAY, WISCONSIN. 2817 UNIVERSITY AVE. IS A MULTI-UNIT APARTMENT
BUILDING CONSTRUCTED OF TAN BRICK WITH A BLACK ROOF. THE NUMBERS
"2817" APPEAR IN BLACK NUMBERS ON THE SOUTH WEST CORNER OF THE
BUILDING. APARTMENT #5 HAS A GARAGE ASSOCIATED WITH THE APARTMENT
THAT IS LOCATED ON THE GROUND FLOOR OF THE BUILDING AND IS NOT
ATTACHED TO THE APARTMENT. THE GARAGE DOORS ARE TAN IN COLOR AND
FACE SOUTHWEST. THE INTERIOR ENTRACE TO THE GARAGE ASSOCIATED WITH
APARTMENT #5 IS BROWN IN COLOR AND MARKED WITH A GOLD NUMBER 5.

Case 1:20-mj-00735-JRS   Filed 10/06/20   Page 28 of 31   Document 1

## **ATTACHMENT B**

### ITEMS TO BE SEIZED:

Evidence related to the conspiracy to distribute and possess with intent to distribute controlled substances in violation of Title 21, United States Code, Sections 846 and 841(a)(1), money laundering in violation of Title 18, United States Code Section 1956, and possession of firearms by a prohibited person and in furtherance of drug trafficking crimes contrary to Title 18, United States Code Sections 922 and 924(c) to include the following:

1.  Books, records, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

2.  Computers, computer disks, CDs, and other electronic data that may contain information relating to the distribution of controlled substances.

3.  Address books, cellular telephone contact lists, and any other papers reflecting names, addresses, and or telephone numbers which may be evidence of persons involved in the importation and distribution of controlled substances in violation of federal controlled substance laws.

4.  Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashier checks' receipts, passbooks, back checks, and other items evidencing the obtaining, secreting, transfer, concealment, and /or expenditure of money which are evidence of conspiracy to distribute controlled substances in violation of Title 21, United States, Sections 846 and 841(a)(1).

5.  Any indicia of control of the property described above which may identify person for whom the controlled substances are intended.

6.  Paraphernalia including, but not limited to, scales, and other weighing devices,

measuring devices, and containers of various types commonly associated with the storage and use of controlled substances which are evidence of distribution of controlled substances in violation of federal controlled substance laws.

7.  Firearms and ammunition.

8.  Controlled substances.

9.  United States Postal Parcel boxes, receipts, labels and shipping related items.

10. Safes, lockboxes or other secured storage containers and their contents.

11. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, electronic storage device) that is called for by this warrant, or that might contain things otherwise called for by this warrant;

    a.  evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access,

29 | P a g e

use, and events relating to crime under investigation;

e. evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device;

k. contextual information necessary to understand the evidence described in this attachment.